*Court of Common Pleas, Dauphin County, June 2d, 1862.*

HERSHEY *v.* WEITING.

Where a person confessed a judgment to another for the purpose of delaying the creditors of the former in the collection of their debts, a court of equity, on the application of the debtor, will not set aside such judgment, although it was obtained by misrepresentation and fraud, and the party confessing it was the mother-in-law of the party to whom it was given.

BY THE COURT.—If this case had been brought before the court by a bill filed on behalf of Mrs. Hershey's creditors, it

would have presented no difficulties whatever. That the design of both parties in confessing the judgment, releasing the dower, and assigning the bank stock, was to delay and hinder, if not defraud, the creditors of Mrs. Hershey, is self-evident, notwithstanding the denial of both parties. Although the object is to keep the fraudulent intention in the background, and present nothing but the equity of the respective parties, yet the court cannot fail to see in the evidence that the moving motive of the whole transaction, on the part of the plaintiff, was to prevent an immediate sacrifice of her property by the banks, to which she was indebted; and that the defendant operated on her fears in that particular for the double purpose of defrauding both the plaintiff and her creditors. It is by no means difficult to discover that the defendant concocted the whole scheme of dishonesty, by setting up a pretended claim against the plaintiff to a sufficient amount to cover all, or nearly all, that she was worth, making use of the influence of his situation as a son-in-law, his knowledge of business, and her ignorance of the power of her creditors, to induce her to execute the writings. But she cannot claim to have been entirely innocent. She feared that the law gave the banks power to proceed against her property without delay, and expected it to be sacrificed by an immediate sale, and by giving Mr. Weiting the preference, the loss would be obviated, the creditors delayed, the debts eventually discharged, and all of her claims restored.

We do not believe that Mrs. Hershey intended to defraud any one, but the statute of 13 Elizabeth is equally severe on all transactions designed to *delay or hinder*, as on those intended to defraud creditors. She knew that she did not owe Weiting, that he had no legal or just claim upon her; and she knew that she did owe others, who were to be kept at bay for the present, at least. The bill itself shows, in its language, that she had been led to believe that the creditors would push their claims immediately; and that banks were endowed with some summary method of proceeding; and the eighth, fourteenth, and twenty-third interrogatories clearly indicate that Weiting had received the judgment, release, and transfer, to prevent the creditors from seizing the plaintiff's property. Although in morals there may be an immeasurable distance between the guilt of these parties, yet in law there is none. The person who planned and concocted the scheme stands on the same platform with one who lent it an almost passive acquiescence, and the intellect of each must be measured by no other standard than a knowledge of right from wrong, or the capacity to transact business. The writings asked to be set aside and revoked all transfer *legal rights*, and are *executed* contracts. If executory we would not enforce their execution. *Ex turpi causâ non oritur actio* is a legal maxim. But it is equally settled that, if the contract is already executed, it cannot be set aside on account of its

illegality or immorality, for the maxim is, "*in pari delicto melior est conditio possidentis or defendentis.*" The court will not lend its aid to assist either party. If the one has a judgment, the court will not relieve against it; if an assignment, the assignee will hold the article assigned; and if a release, it may be set up to avoid future payment; and the party giving either cannot avoid it by showing his or her own turpitude. Every such transaction is void as to the creditors intended to be defrauded, but binding between the parties.

The position was taken before the master, on the hearing, and sustained by him, and has also been assumed in court, that as Mrs. Hershey stood in a confidental relation towards Mr. Weiting, and the latter became her adviser, he would not be permitted to gain any advantage over her in a bargain, but that she would be relieved in equity against an unjust or oppressive contract. The position is unquestionably sound: wherever a confidential relation exists, or is assumed, the confidence must not be abused. We find that bargains between those who stand in the relation of parent and child, attorney and client, physician and patient, pastor and parishioner, trustee and *cestui que trust,* and in short almost all the confidential or dependent relations in life, are looked upon with distrust in courts of equity, and we consider this one of those relations, a son-in-law with his wife's mother. It is said that it is only where the parent has an advantageous bargain over the child that equity will relieve. The position is not tenable, for whether the aged and feeble parent reposes confidence in the active business son of middle age, or the young and inexperienced son in the more experienced and business-trained father, equal good faith is demanded in the dealings between them, neither is permitted to take advantage of, or overreach the other; and this doctrine we would apply to the transactions between a middle-aged, active, and energetic son-in-law, and an aged, feeble, and distressed mother-in-law, who looked to him for honest counsel and advice in her almost overwhelming troubles. If no other difficulties presented themselves we would agree with the master in rescinding and revoking these unreasonable and overreaching contracts, by which this aged lady has been swindled and defrauded out of all her worldly substance.

After a careful examination of all the evidence, we are of the opinion that there was no debt whatever due, either in law or equity, by Mrs. Hershey to Mr. Weiting and wife, at the time these writings were drawn. It is very doubtful whether any ever was due. From the testimony of Mr. Prestle, it appears that over thirty years ago, when Mrs. Hershey lent him the money, she explained that it was a legacy from her father's estate; that her husband would not have or use it, and after his death it still remained in the house. We are satisfied that she took it

[Hershey v. Weiting.]

as her own, with the consent of the executors of her husband, and under such circumstances the law would not require her to repay it. The husband had never reduced it into possession, which is a mixed question of act and intention.

We are also satisfied that Mrs. Hershey received but one thousand dollars, not two thousand, as claimed, and the bond given by Kendig and Prestle was for that money. Neither recollects of paying more than the one thousand dollars. Mr. Kendig thinks that the bond was given in Hershey's lifetime, but in that he could easily be mistaken. All the witnesses agree that Weiting never claimed but one thousand until this demand was set up, and it is very evident that this was done, as he stated to Judge Nisley, "*to put a face on the transaction.*" Besides, it appears pretty clearly, that all claim to the money was given up by Weiting in 1847, in consideration of the release of dower, and although there may have been no valid claim of dower in the land, yet it was perhaps quite as good as Weiting's claim to the money. In addition, Mr. Weiting afterwards recovered nearly two thousand dollars from the representative of Hershey, one-third of which belonged to the widow, and although she declined taking it, as money gained at law, yet her creditors might, with great plausibility, insist that she should receive what was legally her own, before paying to Weiting, to their prejudice, what was not legally his. We are satisfied, from all the evidence, that this claim of Weiting was a mere "*trumped up*" affair, presented for the purpose of covering Mrs. Hershey's property from her creditors, and that the implied admissions from her silence, and her statements made when the writings were executed, was part of the scheme of delusion concocted by Weiting. This is still further evidenced by the injunctions of secrecy on the witnesses, and the efforts to prevent Mrs. Hershey's friends, to whom she was accustomed to look for advice, as well as her creditors, from knowing of the transaction. This case presents a single new point: can a court of equity, which has ample ground presented to it for rescinding an executed contract on account of fraud and abuse of confidence, do so when satisfied from the whole case that the object of the writings was to delay and hinder creditors in the collection of their just debts? Can the court overlook the statute and its effect on the act of the parties, and consider the equity alone? I am of the opinion that it cannot, and although the equity would otherwise be sufficient to justify a rescission of the contract, yet the effect of the statute must be primarily considered, and that makes the transaction void as to the party intended to be defrauded or delayed, yet leaves it binding between the parties. We cannot rescind these writings for any *equitable reason*, when it clearly appears that the object of executing them was to delay or hinder creditors. Even independent of the statute, a contract

infected with actual fraud against a third person, not a creditor, will be enforced in equity between those who intended to perpetrate the fraud (Sherk *v*. Endress, 3 W. &. S. 256). If the statute was out of the way, or the manifest *object* of the writings could be overlooked, we should not hesitate a moment to rescind all of them, for the reasons already given.

It is urged, however, that these are not debts of Mrs. Hershey, that she is a mere surety, and they are not *her* creditors. There is no such distinction known to the law, and a mere accommodation indorser of such a note was held to come within the act, even before its dishonor (Hamet *v*. Dundass et al., 4 Barr, 178).

We feel ourselves constrained by the law of the land to dismiss this bill at the cost of the complainant, but shall not allow the respondent his costs, as we consider him the principal perpetrator of the fraud.

Should the creditors hereafter choose to investigate the transaction, they can do so by their bill for that purpose.

AFFIRMED BY THE SUPREME COURT (14 Wr. 240).

*Lamberton and Etter, for plaintiff.*

*Kunkel and Simonton, for defendant.*